IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RICHARD TAYLOR,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, UNITED STATES AIR FORCE, and DOES 1-TO 500, inclusive,<br><br>    Defendants. | No. C03-00604 HRL<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Docket No. 85 |

### I. INTRODUCTION

Richard Taylor, a retired professional tree trimmer and avid golfer, routinely volunteered his services to trim trees at the Moffett Field Golf Course ("Moffett"). Moffett is owned by the United States and, at the time, was operated by the US Air Force. One day, Taylor was up in a 25-foot tall tree cutting limbs in preparation to fell the tree. He had not fastened his safety harness because at that particular location there was no convenient point of attachment. He fell about 20 feet to the ground, sustaining serious injuries, and subsequently brought a Federal Tort Claim Act (FTCA) suit for damages. Allegedly, Moffett's management was negligent for allowing him to trim trees at all or, alternatively, for failing to provide him with an aerial lift. The parties agree that the material facts are not in dispute. The government

moves for summary judgment on the basis that Taylor's claim is barred by California's "primary assumption of the risk" doctrine.[1] This court agrees and grants the motion.

## II. FACTS

At the time of the accident, September 28, 1999, Taylor was 67 years old. A logger in his youth (1948-52), he had spent 35 years (1955-90) as a professional tree trimmer. Taylor Deposition, 12-13. In retirement since 1990, he golfed four or five times a week, including once or twice a week at Moffett. Id. Sometime in 1998 Moffett management organized a volunteer cleanup day, and Taylor offered to help. Since, according to Taylor, it was "common knowledge" that he was a tree trimmer, he was asked to do some minor trimming of tree limbs. He readily agreed because he wanted the course to look good for his own enjoyment, as well as that of other golfers.

There was no money in Moffett's budget to pay for a tree trimmer. Once Moffett's managers realized that Taylor was willing and able to do that work as a volunteer, they often asked him to trim limbs and, sometimes, to remove trees. Taylor estimated that it "could have been" some 20 to 40 times that he did tree work at Moffett and that he trimmed or cut at least 30 or 40 trees. Id. at 23-24. Sometimes a friend would help him, other times not. Management would tell him what needed to be done, and he would do it at his leisure, often as frequently as once a week. He furnished all of his own equipment. No one at Moffett was knowledgeable about tree surgery, so it was left to Taylor to decide how to do each task. Id. at 30-31.

Taylor had climbed trees "many times" at Moffett before the day of the accident. Id. at 32-34. He "normally" wore a safety harness which, when affixed to a branch above his head, would prevent him from falling if he lost his balance. Id. However, that he did not always wear the safety harness (or clip it to the tree) is evident, since he had fallen from trees eleven times

---

[1] Pursuant to Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c), plaintiff and the United States have consented that all proceedings in this matter may be heard and finally adjudicated by the undersigned. Although plaintiff has also named the United States Air Force and several Does as defendants, the United States is the only proper defendant in an action brought under the FTCA. See Lance v. United States, 70 F.3d 1093, 1095 (9th Cir. 1995) (citing Woods v. United States, 720 F.2d 1451, 1452 n.1 (9th Cir. 1983).

2

before throughout his career, once from even the height of 65 feet. Moffett never directly compensated Taylor for his services, and he did not expect any. However, for what "could have been" 20 or 30 times, he was indirectly compensated - if only modestly - when management waived the usual fee for his play on the course. Id. at 21-23.

A couple of days before the accident, the course managers asked Taylor to remove a 25-foot tall tree at the 10th tee. A camera had been installed so that the pro shop could monitor golfers at that location, and a tree obscured the camera's field of vision. On September 28, Taylor arrived alone (no friends were available that day to help out), "probably" told someone in the pro shop that he was going to take down the tree, and went to the 10th tee. He climbed the tree and began cutting limbs in preparation for dropping the tree. Id. at 37, 39-42. According to Taylor, he was wearing his safety harness (as was his "normal practice"), but, for one branch, there was no suitable location for him to fasten the harness. Id. at 32, 101-02. Obviously, he knew that working without the harness attached to the tree was more dangerous. (In fact, Taylor volunteered that tree surgery was "inherently dangerous." Id. at 101-02.) When he could not attach the harness, Taylor did not change his approach, seek assistance, or stop work. He went ahead and something went wrong. He lost his balance, fell 20 feet to the ground, and was badly hurt.

### III. STANDARD OF REVIEW

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Since there is no dispute as to the facts, the court will consider whether, based on those facts, defendant is entitled to judgment as a matter of law.

In suits filed under the FTCA, the government is liable for injury in the same manner and to the same extent as a private individual would be in like circumstances under the laws of the state in which the alleged tort occurred – here, California. *See* 28 U.S.C. §§ 1346(b) and 2674; *see also* Ravell v. United States, 22 F.3d 960, 961 (9th Cir. 1994) ("[T]he United States must be treated as a private person for the purposes of . . . analysis [under the FTCA], even if a

3

different rule would apply to California governmental entities"). There is no dispute that California substantive law on assumption of the risk applies.

## IV. DISCUSSION

### *A) Assumption of Risk Doctrine*

Under California's traditional tort doctrine, a finding of contributory negligence would completely bar an injured plaintiff's recovery. That changed with Li v. Yellow Cab, 13 Cal. 3d 804 (1975), which jettisoned contributory negligence in favor of a new doctrine: comparative negligence. A plaintiff who was himself negligent was not denied all recovery. Id. Instead, his recovery was reduced by comparing his negligence with that of the defendant and reducing the recovery by the percentage that plaintiff's negligence represented to the total. Id. After Li, California's courts then struggled to harmonize the new comparative negligence doctrine with the traditional tort defense of assumption of risk. As a result, assumption of the risk doctrine morphed into something bizarre, a construct relying on logically indefensible distinctions between "reasonable" and "unreasonable" assumption of the risk. Ultimately, the California Supreme Court took up the task to straighten out assumption of the risk

In the landmark case of Knight v. Jewett the Supreme Court reconceptualized the doctrine of assumption of the risk as a defense to a tort action sounding in negligence or strict liability. 3 Cal. 4th 296 (1992). The "reasonable" and "unreasonable" analytical framework went out. In its place, the court held that the applicability of the defense in any given fact situation would turn on the distinction between "primary" and "secondary" assumption of risk. Id. at 308-09.

> [W]hether the defendant owed a legal duty to protect the plaintiff from a particular risk of harm [no longer turns] on the reasonableness or unreasonableness of the plaintiff's conduct, but rather on the nature of the activity or sport in which the defendant is engaged and the relationship of the defendant and the plaintiff to that activity or sport.

Id. The court went on to explain that primary assumption of the risk would refer to "those instances in which the assumption of risk doctrine embodies a legal conclusion that there is 'no duty' on the part of the defendant to protect the plaintiff from a particular risk." Id. Secondary assumption would involve "those instances in which the defendant does owe a duty of care to

the plaintiff but the plaintiff knowingly encounters a risk of injury caused by the defendant's breach of that duty." Id.

Knight's teaching is to study the nature of the activity and the relationship between the plaintiff and defendant. Whether or not a defendant owes a duty to the injured plaintiff is a question of law for the court, and is a question appropriate for resolution by summary judgment. Avila v. Citrus Community College Dist., 38 Cal. 4th 148, 160-61 (2006) (See case discussion *infra* pg. 14). Although instances where the primary assumption of risk defense is found to apply often involve firemen (injured while fighting a fire where the defendant building owner is alleged to have negligently caused the fire) or sports (where one participant is injured by the rough play of another participant), the cases are not so limited. The doctrine has been found to apply to veterinarians (dog bites vet during treatment), a shark handler, and a nurse's aide injured by a mentally unstable patient. It is not limited to situations where the plaintiff is receiving compensation for whatever activity that occasioned the injury. A volunteer fireman's claim was held barred by primary assumption of the risk. So was the claim of a student injured during a role-playing exercise at a junior college course on police arrest procedures. Saville v. Sierra College, 133 Cal. App. 4th 857 (2005), made it clear that the doctrine announced in Knight was not limited to sports or employment-related activities.[2] "Instead, it established the defense's governing principles of risk for application on a case-by-case basis." Id. at 870.

### *B) Application of Primary Assumption of Risk Doctrine: Nature of Activity and the Parties' Relationship*

In Rosenbloom v. Hanour Corporation, the defendant operated the Shark Club, an enterprise that featured a shark aquarium. 66 Cal. App. 4th 1477 (1998). Reef Systems was hired periodically to clean the aquarium, a job that started with taking out the sharks. Plaintiff, an employee of Reef, was bitten while one of the sharks was being removed. He sued the Shark Club for negligence and strict liability. The Club moved for summary judgment, urging that the causes of action were barred under the primary assumption of risk doctrine. The court rejected

---

[2] Full case discussion *infra* pg. 7.

5

plaintiff's proposed distinction that, unlike cases involving injured public safety workers (e.g., firemen), here there was no public policy in favor of extinguishing the Club's liability. Id. at 1480-81. The "assumption of the risk doctrine does not hinge upon such considerations." Id. at 1481, n.5. It could see no analytical difference between the shark handler here and the dog-bitten veterinary technician in Neighbarger v. Irwin Industries, 8 Cal. 4th 532 (1994):

> Although the elements of public service and public compensation are missing [in application of the veterinarian's rule], the defendant's ordinary duty of care is [nevertheless] *negated* due to the nature of the activity and the relationship of the defendant to the plaintiff ... [V]eterinarians accept [the occupational hazard of dog bites] by undertaking their employment and are in the best position to guard against [such risks] by taking the necessary precautions.

Rosenbloom, 66 Cal. App. 4th at 1481, n.5 (quoting Neighbarger, 8 Cal. 4th at 545) (emphasis and inserted text in Rosenbloom). The court affirmed the grant of summary judgment and concluded, again quoting Neighbarger, that it was "unfair to charge the defendant with a duty of care to prevent injury to the plaintiff arising from the very condition or hazard the defendant has contracted with the plaintiff to remedy or confront." Id. (quoting Neighbarger, 8 Cal. 4th at 542).

In Herrle v. Estate of Marshall, the plaintiff was a certified nurse's aide who worked in a convalescent hospital. 45 Cal. App. 4th 1761 (1996). Many of the patients suffered from Alzheimer's disease, and such persons could often be aggressive, even violent. Plaintiff knew that such patients could be violent, had heard of workers who had been struck by patients, and had received training in how to approach, handle, and restrain them. One such patient was Helen Marshall, who had been admitted to the hospital by her family because her disease had progressed to the point where she had become a danger to herself and to others. One day, Marshall became agitated while being assisted by another member of the hospital staff and started to struggle. Plaintiff hurried over to help and was struck by Marshall. She sued Marshall's estate. Summary judgment in favor of the estate was affirmed on appeal. Id. at 1773. The court noted that if Marshall had injured a stranger - say a visitor to one of the other patients - primary assumption of the risk would not apply. *See* id. at 1769-70. But, between Marshall and plaintiff there was a relationship, exactly the kind of relationship that supported application of primary assumption of risk. Marshall's relatives did need, seek, and obtain services of

6

plaintiff (through plaintiff's employer). Id. "It would be unfair to impose on defendant the very duty of care" that had been intrusted to plaintiff and her employer. Id. at 1772.

In Saville, plaintiff was a college student who aspired to become a policeman. 133 Cal. App. 4th 857. He enrolled in a peace officer training class. One component of the class was a practical exercise. The instructors first showed students several techniques for taking physical control of an offender, and then the students were paired off to practice the "take downs" between themselves on padded mats. Plaintiff was concerned about an old neck injury, but said nothing and went through the exercises with his partner. Although he was given the option of only playing the role of the officer (where he always would be performing the take down, rather than getting taken down) he chose to take turns with each role. He was injured when his partner, playing the arresting officer, performed a "forehead sweep."[3] This exercise went off without a hitch several times, but on the last take down one of the "officer's" knees, which was incorrectly positioned, collided with plaintiff's neck as he fell. Id. at 864. Saville sued the college for negligence for failing to tell him that the class involved risk of injury, for not evaluating his suitability to participate, and for not properly training him and his classmates to do the take down maneuvers.

In affirming summary judgment, the court examined the nature of the activity and the relationship of the parties. As for the nature of the activity, it went without saying that this was an inherently dangerous activity. Id. at 867 ("One person is intentionally throwing another to the ground."). The court noted, "[w]henever gravity is at play with the human body, risk of injury is inherent." Id. (Internal citations omitted). The court noted that if a duty were to be imposed to eliminate the risk of injury, it would not only undermine vigorous participation in the activity, but would defeat the very purpose of the class. Id.

Furthermore, the plaintiff's claim that the instructors were negligent in their training and supervision gained no traction because there was ample evidence that they had accurately and

---

[3] To perform this maneuver, the "officer" approaches the "offender" from behind, and wraps one hand around the offender's face. The officer then grasps the bridge of the offender's nose and places the elbow of that same hand on the offender's back. The officer then pulls back the head, which compresses the spine and causes the offender to fall.

7

carefully demonstrated the moves first and then had observed the students as they did the moves themselves. Id. at 871. And, even assuming that the instructors were negligent, this would only matter if their conduct was "so reckless as to be totally outside the range of ordinary teaching for the class." Id. Absent a finding beyond mere negligence, the primary assumption of risk defense remained available to defendants.

Torres v. Reardon, 3 Cal. App. 4th 831 (1992), was decided before Knight, and thus does not rely on Knight's analytical approach. It is nevertheless persuasive because the outcome would have been the same if it had. Defendant homeowners contracted with plaintiff, an independent contractor who did gardening and landscaping, to trim branches from a tree. In doing the job (without a safety harness), plaintiff fell and was badly hurt. Id. at 835. He sued claiming the defendants were negligent in asking him to trim the tree without assuring themselves he was competent to do the job. The court quickly rejected that theory, since plaintiff had represented he was up to the job and there had been no reason for defendants to not believe him. Id. at 836-43. Under a Knight analysis, here would be an inherently dangerous activity and a relationship between the parties where the ability to control the risk was uniquely in plaintiff's hands.

In short, primary assumption of the risk applies to worthwhile activities where conditions or conduct that might otherwise be viewed as dangerous are often an integral part of the activity. The doctrine is applied because to impose a duty on the defendant would chill the activity itself and alter its fundamental nature. Thus, as a matter of law and good policy, courts have deemed it unfair to impose a duty on defendant in those circumstances.

Applying these principles to the undisputed facts in the present case requires the conclusion that tree trimming is an inherently dangerous activity.[4] This would be the court's conclusion even if the plaintiff himself had not said so. People have been falling out of trees (and hurting themselves) since the time they figured out how to climb them, and - as the Saville court observed - when the human body challenges gravity, gravity prevails. As for the second component of the doctrine, the relationship between Taylor and the defendant fits a primary

---

[4] Plaintiff's attorney's argument to the contrary is entirely unconvincing.

8

assumption of the risk analysis. The golf course managers had tree trimming needs, and plaintiff volunteered to fill those needs. Plaintiff was the expert. He provided the equipment. He chose the time and manner that the jobs would be done. And, he alone decided if he could or should do the job. This court's analysis up to now points toward a holding that primary assumption of risk bars Taylor's claims. However, plaintiff makes two additional arguments which the court must address before reaching a final conclusion.

### C) *Primary Assumption of Risk Defeated Because defendant (a) "increased" the risk or (b) imposed a "duty" upon itself?*

#### a. Increased the risk?

The California cases make it clear that the magnitude of "risk" that a plaintiff assumes under the primary assumption of risk doctrine is the normal, ordinary risk of the activity in question. However, if, unknown to plaintiff, a defendant significantly increases the quantum of risk, then the primary assumption of the risk defense does not apply. Two examples will suffice.

In Lipson v. Superior Court, the fire department was summoned to clean up a chemical "boil-over" at defendant's plant. 31 Cal. 3d 362 (1982). Defendant argued that the "firefighters rule"[5] should bar recovery. However, in Lipson the defendant misrepresented to the arriving fireman the nature of the risk from the spilled chemicals and, as a result, plaintiff-fireman did not don suitable protective gear and was injured. Id. at 370. Since plaintiff was hurt as a result of defendant's "independent act of misconduct," there was no bar based on primary assumption of the risk. Id. at 374.

Another illustrative case is Von Beltz v. Stuntman, Inc., 207 Cal. App. 3d 1467 (1989). Although it was decided before Knight, the outcome on its assumption of risk issue would have been the same under Knight's reconceptualized analysis. Plaintiff was a stunt woman involved in a car chase being staged for a movie. The stunt had been practiced once with the cars

---

[5] The so-called "firefighters rule" is the best-known illustration of the doctrine of primary assumption of risk. Id. At 367-70. It holds that a fireman cannot sue for injuries incurred in dealing with the very reason (usually, a fire) that he was summoned to the scene. Id. In effect, a defendant has no duty to the fireman to prevent the fire from starting. Id.

9

traveling at a certain prescribed speed. Id. at 1474-76. Before the second "take," however, the film's director decided to double the speed of the vehicles, but the plaintiff (who was a passenger in one of the cars) was not told about the intent to increase speed. On the second take there was a crash that seriously injured her. Id. She sued. Defendants argued she had assumed the risk by engaging in an inherently dangerous activity. The court disagreed, finding that plaintiff assumed the risks of the stunt as it was originally run, but not the increased risk that arose when defendants decided to double the speed without her knowledge. Id. at 1480.

In the present case, Taylor argues that defendant "increased" his risk when course management declined to furnish an aerial lift so that he would not have to actually climb the tree.[6] The facts are that on one or more earlier occasions when Taylor was trimming trees at Moffett he asked if he could be provided a lift. Taylor Deposition, pg. 90. He was told that the course had no money to pay for the hire of a lift. Plaintiff went ahead and did those earlier jobs anyway. He did not ask for a lift to trim the tree on the 10th tee on September 28, 1999. Even now he does not claim that one was necessary or that he even wanted it for that job. (The tree, after all, was a relatively modest 25-feet tall.) He certainly does not claim that a tree trimmer always should have a lift when he needs access up into a tree. And, of course, he was then, as in past instances, always free to decline the job. What he does say is that a lift would have made the job "safer," and that - since defendant did not provide that added measure of safety - defendant was negligent and the primary assumption of the risk defense does not apply.

Plaintiff's argument is analytically flawed. First, the "negligence" of defendant is irrelevant to an assumption of the risk analysis. *See* Saville, 133 Cal. App. 4th at 871. Defendants are always alleged to be negligent (and often may be), but negligence without a corresponding duty is not actionable. Duty is the focus, not negligence. Second, the facts here are unlike those cases where a defendant was found to have increased the risk and thereby denied itself a possible primary assumption of risk defense. In those cases, the increased risk was a risk unknown to the plaintiff (the doubling of the speed in Von Beltz; the caustic nature

---

[6] A properly positioned and correctly used aerial lift would dramatically reduce the possibility of a fall.

10

of the chemical spill in Lipson). In short, defendants there did something to increase the quantum of risk above that which anyone would reasonably expect to encounter while engaging in the inherently dangerous activity in question. But nothing like that happened here.[7] Every risk that the plaintiff encountered was a risk that would have been known to any and every tree trimmer put in that position. The absence of the aerial lift, of course, was obvious. Plaintiff himself was in the best position, indeed the only position, to assess the totality of the risk and to adopt a prudent course of action.

### b. Self-imposed duty?

Plaintiff urges this court to conclude that defendant had a self-imposed duty to not allow him, a volunteer, to perform duties which made him susceptible to injury or subjected him to physical hazards. Since defendant violated that duty, the argument goes, the government is liable for his injuries regardless of the primary assumption of the risk doctrine. In other words, here is a "duty" that trumps assumption of the risk. (In fact, the government would effectively become Taylor's insurer.) In support, Taylor relies on two documents obtained from defendant in discovery.

The first document is a single page headed "Chapter 5, Volunteer Program" from some unknown document called AFI34-262, dated April 27, 2000.[8] The text refers to volunteers who donate services to "authorized Services MWR programs" and cautions they should not perform duties where they are susceptible to being injured or injuring others. The other document is a multi-page Memorandum, dated May 12, 1998, reporting on the annual hazard assessment survey of the Moffett Field Golf Course Maintenance Shop, authored by Air Force Technical Sergeant Smith who headed the local Bioenvironmental Engineering unit. Primarily, the Memorandum evaluates proper storage of hazardous chemicals and employees' access to and

---

[7] Plaintiff's argument would make better sense if the facts were different. For example, if there was a hornet nest in the tree and course management not only knew it, but knew the hornets had a penchant to bite those who got too close to the tree, then defendant would indeed have increased Taylor's risk if he had been sent out to cut it down without warning. (At least, this could be a potent argument if the fall was due to a hornet's bite.)

[8] Plaintiff's attorney could not explain what the initials "AFI" meant. Defense counsel thought they stood for "Air Force Instruction."

11

use of protective gear. However, there is one paragraph headed "Volunteer/Summer Hire Program" which requests: "A task listing for volunteer/summer hire responsibilities should be forwarded to BES for review. This will ensure that there are no chemical or physical hazards are [sic] associated with their jobs."

The United States acknowledges the documents were produced in discovery, but objects to their admissibility on the basis of lack of foundation. The court sustains the objection to AFI34-262. There is no showing of what the document is or its purpose, and no showing of what the Services MWR programs were. More importantly, it is dated seven months after Taylor's accident, and there is no evidence that it or something like it was in effect when plaintiff was hurt. (In his deposition, the course manager at that time said he was aware of a volunteer program but did not "know about any of the rules." Hill Deposition, pg. 50.) However, with respect to the Memorandum, Defendant's objection is overruled. At least this is an entire document, and its primary purpose seems clear: to report on a survey and inspection.

Although the Memorandum is admissible, it does not carry the weight that plaintiff ascribes to it. The expressed concern in the Memorandum about keeping volunteers away from "hazards" could be nothing more than the opinion of Sergeant Smith. At its most persuasive, it may indicate that there is an Air Force policy or "rule" behind it. Yet, without more, the document does not prove plaintiff's claim that defendant had a self-imposed and legally enforceable "duty" to Taylor not to let him trim trees.

However, it is possible a reviewing court could disagree with this court's characterization of the Memorandum or might say it was error to sustain the objection to admissibility of the AFI page. Therefore, this court will assume for discussion purposes that there was an Air Force "rule" that prohibited using volunteers to do hazardous jobs. Assuming primary assumption of the risk was otherwise established, would such a "rule" defeat it? Plaintiff offered no helpful case authority. The court found none directly on point, but there are cases that guide the analysis. Two cases examine whether a statute which imposes a duty upon defendant trumps the application of primary assumption of the risk. A third case, while not

squarely aligned with the present one, holds that a self-imposed rule (duty) does not trump either.

In Priebe v. Nelson, the injured veterinary worker urged that primary assumption of the risk could not be applied to bar her claim because California Civil Code § 3342 imposed strict liability on a dog owner for a dog bite. 39 Cal. 4th 1112 (2006). That is, if a statute mandates that an owner is liable when his dog bites someone, then would (or should) the statute foreclose primary assumption of the risk? Id. at 1128-32. The court said no.

> We therefore conclude that Priebe, by virtue of the nature of her occupation as a kennel worker, assumed the risk of being bitten or otherwise injured by the dogs under her care and control while in the custody of the commercial kennel where she worked pursuant to a contractual boarding agreement. The Court of Appeal correctly concluded a strict liability cause of action under the dog bite statute (§ 3342) was therefore unavailable to Priebe.

Id. at 1132. The California Supreme Court explained that a finding that primary assumption of risk applies in any given factual situation is, in essence, a finding that the defendant's "usual duty of care" should be excused. The dog bite statute establishes the usual duty of care, but the conclusion that assumption of the risk applies, negates that usual duty. The "dog bite" statute was intended to protect members of the general public, and nothing in the statute indicates that the legislature meant to create owner liability to an injured veterinarian who has sole control of the dog, has been trained to recognize risk, and is the only one in a position to prevent injury. Id. at 1130. Basically, a statute that created a duty would not cancel out primary assumption of the risk unless it specifically said that it was intended to do just that.

Although it arose in the context of a sporting injury, Moser v. Ratinoff reaches the same result for the same reason. 105 Cal. App. 4th. 1211 (2003). Plaintiff and defendant were participating in a noncompetitive, long distance bicycle ride on public highways. Defendant accidently bumped her bicycle into plaintiff's, causing him to fall and sustain injuries. Id. at 1215-16. He sued the offending rider for negligence. The court concluded that this particular bicycle ride was the kind of athletic activity which involved a degree of inherent danger and that primary assumption of the risk would ordinarily apply where one participant accidently injured another. But, argued the plaintiff, it should not apply where the defendant had violated two Vehicle Code statutes (governing proper and safe operation of a bicycle). Id. at 1223-26.

13

That, plaintiff contended, amounted to negligence per se and precluded application of the primary assumption of risk doctrine. Id. The Court of Appeal said no.

> Because a majority of the current Supreme Court justices have expressed the view that a violation of a statute that indicates no legislative intent to eliminate the assumption of risk defense does not displace the primary assumption of risk doctrine, and because there are no cases inconsistent with that view, we adopt the Distefano court's conclusion. [Distefano v. Forester, 85 Cal. App. 4th 1249 (2001)]. Although the facts show that Ratinoff violated provisions of the Vehicle Code [...] based on our conclusion as to the present state of the law, such violations do not nullify Moser's assumption of the risk.

Id. at 1226.

A case even closer on the mark is Avila, 38 Cal. 4th 148. Plaintiff sued the school district after being injured while batting during an intercollegiate baseball game. It was the type of case that a primary assumption of risk defense would apply unless plaintiff could show that the district had increased the inherent risk of the activity. Id. at 152-54. One argument that the plaintiff tried was that the risk was "increased" because the game was allowed to take place at all. Id. at 163-64. Allegedly, league rules prohibited preseason games, and he had been hurt in a preseason game. The court rejected the argument.

> [T]he only consequence of the District's hosting the game was that it exposed Avila, who chose to participate, to the ordinary inherent risks of the sport of baseball. Nothing about the bare fact of the District's hosting the game enhanced those ordinary risks, so its doing so, whether or not in violation of the alleged rules, does not constitute a breach of its duty not to enhance the ordinary risks of baseball.

Id. at 163.

"The existence of 'duty' is not an immutable fact of nature but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." Id. at 160-61 (internal citations, quotation marks and emphasis omitted). The teaching of Priebe, Moser, and Avila seems clear. A statute or a rule establishing a duty does not override what would otherwise be a proper case for applying primary assumption of the risk unless the statute or rule specifically says that is what it intends.

The assumed duty to not expose volunteers at Moffett to hazards is little more than a restatement of the ordinary duty of care that a landowner would have to invitees. However, whatever degree of duty it imposes is negated on account of the nature of the activity engaged in by plaintiff and the relationship between him and defendant. To hold otherwise would make

14

defendant the insurer of plaintiff's well-being while he engaged in an activity that otherwise would require application of primary assumption of the risk. The record does not suggest that the outcome plaintiff seeks was the defendant's intent in adopting the "rule" (if it did exist). For this court to adopt plaintiff's argument would not follow <u>Priebe</u>, <u>Moser</u>, and <u>Avila</u> and simply would not be fair.

## V. CONCLUSION

Tree trimming is one of those useful activities that inherently involves risk of injury to the actor. Taylor, and any other tree trimmer, is properly held to assume the ordinary risks of injury in carrying out his duties. Taylor fell because he had not fastened his safety harness to the tree. There was no hidden or increased risk known to defendant, but unknown to Taylor. Taylor was the only one in a position to assess the normal risks of the job, to choose what equipment was needed, and to determine what safety precautions should be taken or not. Moffett's earlier decision to not provide Taylor an aerial lift does not, as plaintiff urges, both "create" a duty and then breach it - triggering liability - when he later fell. Defendant was under no duty (certainly no duty that would preclude applying primary assumption of the risk) to not allow Taylor - the willing and able tree expert - to engage in an activity that benefitted them both.

While the court is sympathetic towards plaintiff because he was injured on account of his willingness to volunteer his special skills to beautify the Moffett Field Gold Course, analysis of the nature of his activity and the relationship between the parties convinces that his claim is barred by primary assumption of the risk. Summary judgment in favor of defendant is granted.

**SO ORDERED.**

Dated: 3/11/08

HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

15

Notice will be electronically mailed to:

William Walter Burns    wwburnslaw@aol.com

Claire T. Cormier    claire.cormier@usdoj.gov

Jerry Y. Fong    jf@careyandcareylaw.com, jan@careyandcareylaw.com

Counsel are responsible for distributing copies of this document to co-counsel who have not registered for e-filing under the court's CM/ECF program.

Dated: 3/11/08    KRO
Chambers of Magistrate Judge Howard R. Lloyd